# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **RACHEL WATSON,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:17-cv-694** |
| | ) | |
| **FAIRFAX COUNTY, VIRGINIA,** | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

At issue in this Americans with Disabilities Act ("ADA")[1] is defendant's motion for summary judgment.  Plaintiff, a former probationary mental health therapist for defendant who took substantial amounts of leave during her probationary period, was diagnosed with diabetes in late March 2014 and shortly thereafter was terminated.  According to plaintiff, defendant (i) terminated plaintiff because of her disability (ii) failed to provide plaintiff with a reasonable accommodation for her disability, and (iii) terminated plaintiff in retaliation for plaintiff's request for a reasonable accommodation for her disability.  Defendant now seeks summary judgment on all three of plaintiff's claims, arguing that defendant did not terminate plaintiff because of her disability or in retaliation for her request for an accommodation, but rather for the legitimate non-discriminatory reason that plaintiff was excessively absent and did not fulfill the attendance requirements of her job.  As this matter has now been fully briefed and argued, it is ripe for disposition.

---

[1] 42 U.S.C. § 12101 *et seq.*

**I.**[2]

Plaintiff, Rachel Watson, is a resident of Maryland and former employee of the Fairfax-Falls Church Community Services Board ("CSB"), a Fairfax County agency. Defendant, Fairfax County, is a municipal agency within the Commonwealth of Virginia.

On April, 22, 2013, plaintiff began her 12-month initial probationary period[3] as a mental health therapist for the CSB's Wraparound Program. The Wraparound Program provides intensive support for high-risk youths. Plaintiff's responsibilities in her role as mental health therapist were enumerated in a position description form and in a manual of policies, procedures, and training for the Wraparound Program. Specifically, plaintiff was responsible for providing various program services to 10-15 high-risk youths and their families, including face-to-face contact with the youth and family every week,[4] Youth and Family Team (YFT) meetings every month,[5] and regular communications with a case manager. Because these responsibilities required plaintiff to deliver services in the community 85% of the time, plaintiff needed to be capable of driving a vehicle independently and of working at various locations across the Fairfax-Falls Church regional area, including at client's homes and schools. In addition to her

---

[2] The facts here are derived from defendant's list of undisputed facts, most of which were not specifically or properly disputed. Defendant, consistent with Local Rule 56(B) and the Rule 16(B) Scheduling Order, submitted in connection with its motion for summary judgment a separately captioned section listing in numbered-paragraph form all material facts as to which the defendant contends no genuine dispute exists. *See Watson v. Fairfax Cty., Va.*, No. 1:17-cv-694 (E.D. Va. Aug. 7, 2017) (Order). Plaintiff partially complied with these rules, diverging from the rule in many instances by including additional facts in her numbered paragraphs instead of specifically disputing defendant's facts. In any event, the statement of facts listed below is derived from the facts in defendant's statement of undisputed material facts that plaintiff did not specifically dispute. The remainder of the record has also been scoured for facts that arguably could be viewed as conflicting with the facts recited here.

[3] According to the Fairfax County Personnel Regulations, the initial probationary period is "used for closely observing the employee's work, for obtaining the most effective adjustment of a new employee to his/her position, and for separating any new employee or demoting any promoted employee whose performance does not meet performance requirements." Doc. 62 Ex. 42 at 7-3.

[4] The frequency of face-to-face meeting requirements for the Wraparound Program may change as the family progresses through the stages of the program.

[5] YFT meetings are conducted every six to eight weeks depending on the continued needs of the team once the youth reaches the Transition Phase.

service provision responsibilities, plaintiff was required to document her activities internally, including developing an initial Plan of Care ("POC") for each youth within 30 days of the Wraparound Program start date, and then both updating the POC every 30 days and updating records for each youth in a database on a weekly basis. These weekly updates were particularly important because the population CSB serves is at considerable risk for psychiatric emergencies.

Shortly after plaintiff began working as a probationary mental health therapist with CSB, she began taking annual leave, sick leave, and leave without pay. In particular, in her first six months at CSB, plaintiff took leave on the following occasions:[6]

- May 27, 2013- plaintiff took leave to go on a deep sea fishing trip.

- June 12-14, 2013- plaintiff took leave because her daughter was sick.

- June 18, 2013- plaintiff took three hours of leave for her own medical appointments unrelated to her subsequent diabetes diagnosis.

- July 15, 2013- plaintiff took leave for her own medical appointments unrelated to her subsequent diabetes diagnosis.

- July 24-26, 2013- plaintiff took five hours of leave on July 24, a full day on July 25, and four hours of leave on July 26 because her daughter was sick.

- August 2013- plaintiff took leave to go on a trip to Alabama.

- August 2013- plaintiff took leave to go to the zoo for her daughter's birthday.

- September 3-5, 2013- plaintiff took leave because her daughter was sick.

- September 6, 2013- plaintiff took leave for her own medical appointments unrelated to her subsequent diabetes diagnosis.

- September 25-October 2, 2013- plaintiff took leave because of her daughter's illness. Plaintiff took six hours of leave on September 25 and two hours of leave on October 2, 2013.

---

[6] Unless otherwise noted, plaintiff took a full day of leave. This list does not include instances when plaintiff attended medical appointments, but did not record leave.

In total, plaintiff took 132 hours of annual leave, sick leave, and leave without pay in her first 31 weeks with CSB.[7] As a result of plaintiff's absences, plaintiff failed to conduct some weekly meetings with clients, cancelled some scheduled meetings, and missed required documentation deadlines.[8] In addition to plaintiff's leave, plaintiff also frequently arrived at work late, claiming that her commute and traffic made it difficult for her to arrive at work by the scheduled start time.[9]

In preparation for plaintiff's six-month probationary review, plaintiff's supervisor, Jacqueline Sott ("Sott"), raised concerns to Program Manager Jean Bartley ("Bartley") and Service Director Allen Berenson ("Berenson") over plaintiff's absences and tardiness and the impact of those absences on plaintiff's provision of Wraparound Program services. In turn, Bartley and Sott raised these concerns with Tana Suter ("Suter"), the Human Resources Manager for CSB. After raising these concerns with Suter, Bartley and Sott documented the attendance issues in plaintiff's six-month probationary evaluation on November 26, 2013. Specifically, the six-month evaluation noted that plaintiff's attendance was "not acceptable" although her overall

---

[7] Although plaintiff admits she took 145 hours of leave in the first six months of her probationary employment, she points out that a spreadsheet, prepared by human resources in advance of plaintiff's termination meeting, records only 132 hours of leave. Analysis will proceed here on the basis of the 132-hour figure which is sufficient to establish defendant's argument.

[8] Plaintiff argues that her absences did not affect the quality of care that she provided to families served by the Wraparound Program, citing her own declaration to this effect. But this argument does not contradict the fact that plaintiff missed appointments and documentation deadlines. Plaintiff also argues that she did not fail to meet deadlines, again citing only to her own declaration. But this statement is flatly contradicted by plaintiff's deposition in which she admits that she discussed missing deadlines in her meetings with her supervisor. *See* Pl. Dep. 125:14-20. And it is well-settled that where "a party submits an affidavit that is inconsistent with a witness's deposition testimony, the contradictory affidavit is disregarded for purposes of summary judgment." G*reen v. Nat'l Archives & Records Admin.*, 992 F. Supp. 811, 822 (E.D. Va. 1998); *see also In Re Family Dollar FLSA Litig.*, 637 F.3d 508, 513 (4th Cir. 2011) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.") (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)) .

[9] Indeed, plaintiff's tardiness ultimately caused her supervisor to recommend adjusting plaintiff's start time from 8:30 a.m. to 9:00 a.m.

performance was "acceptable." This six-month probationary evaluation was shared with plaintiff.

In November 2013, around the time of plaintiff's six month review, plaintiff began to experience symptoms that would eventually be diagnosed as diabetes. Specifically, plaintiff suffered from fatigue, blurred vision, extreme headaches, impaired cognitive abilities, and digestive problems. As a result, she had difficulty driving,[10] standing for long periods of time, and completing daily life activities.

Following plaintiff's six-month probationary evaluation and the onset of plaintiff's yet undiagnosed diabetes symptoms, plaintiff continued to take annual leave, sick leave, and leave without pay at a rate higher than the rate of her absences for the first six months. Indeed, plaintiff's records reflect that she took 107 hours of annual leave, sick leave, and leave without pay, in the 18 weeks between November 27, 2013 and April 3, 2014.[11] For example, plaintiff took leave on the following days:

- December 9, 2013- plaintiff took two hours of leave for medical issues and appointments related to her as yet undiagnosed diabetes.

- December 30-31, 2013- plaintiff took a full day of leave on December 30 and two hours of leave on December 31 because her daughter's illness.

- January 6, 2014- plaintiff took three hours of leave for medical issues and appointments related to her as yet undiagnosed diabetes.

---

[10] Here, plaintiff argues that no doctor ever told her she should not drive. In support of this fact, plaintiff cites only the deposition of Dr. Jha, who did not start treating plaintiff until 2016, two years after plaintiff was first diagnosed with diabetes. More importantly, plaintiff admits in her deposition that in November 2013, when she started experiencing symptoms of diabetes, she was unable to drive. *See* Pl. Dep. 210:19-211:1. Plaintiff also later informed her subsequent employer that it was unsafe for her to drive when her blood sugar levels were too high. *See id.*

[11] Again the parties dispute the relevant number of hours of leave plaintiff took in her last six months of employment because the parties reference different documents. Plaintiff does not dispute that she took 133 hours of leave but argues that the human resources spreadsheet showed only 107 hours of leave. Analysis will proceed here on the basis of the 107-hour figure which is sufficient to establish defendant's argument.

- February 18-19, 2014- plaintiff took a day and a half of leave for medical issues and appointments related to as yet undiagnosed diabetes.

- March 4-5, 2014- plaintiff took leave because she was having issues operating her vehicle.

- March 20-21, 2014- plaintiff took leave to go on a trip to New York for her birthday.

- March 24, 2014- plaintiff took two hours of leave for medical issues and appointments related to her as yet undiagnosed diabetes.

- March 28, 2014- April 2, 2014- plaintiff took leave for medical issues and appointments related to her now diagnosed diabetes.

Plaintiff continued to miss deadlines and meetings[12] as a result of her leave. Indeed, on January 13, 2014, as a part of her nine-month review of probationary employees, Sott sent plaintiff an email to inform her that documentation was missing from the database for three weeks-worth of cases.[13] In March 2014, in preparation for plaintiff's year-end probationary evaluation, Sott conducted an additional review of plaintiff's documentation and database entries. As a part of this review, Sott created a chart summarizing plaintiff's performance, and concluding that 32% of plaintiff's documentation was submitted late and 25% of plaintiff's documentation was not submitted at all. Sott shared these results with Bartley, noting that plaintiff was not meeting the demands of her job and was not meeting with families, as required, nor was plaintiff submitting the necessary documentation. Accordingly, Sott could not recommend that plaintiff be permitted to transition from a probationary employee to a merit employee. These issues were also raised with Berenson in early April 2014.

---

[12] For example, on March 4, 2014, plaintiff was supposed to meet with the mother of a youth who had been overheard discussing guns and Russian roulette with her boyfriend before leaving the house with a folding knife. Plaintiff, however, took leave on March 4, 2014 because the roads were not plowed and did not meet with the youth's mother until March 13, 2014.

[13] Plaintiff contends that the results of Sott's nine-month review were not shared with her, which is not surprising as there was no requirement for a formal nine-month review. The significant and undisputed facts here are that this nine-month review disclosed that plaintiff's documentation was missing for three-works worth of cases and that Sott informed plaintiff of this missing documentation in an email on January 13, 2014.

Around this same time, plaintiff's medical condition worsened. She was extremely tired, could barely get out of bed, and had difficulty driving. On March 25, 2014, plaintiff was diagnosed with diabetes. Plaintiff understood that from that point forward, she would need to test her blood sugar regularly and either to telework or to arrive late to work in the event her blood sugar levels were high. Accordingly, she would be unable to attend meetings with her clients when her blood sugar prevented her from driving. Plaintiff is unaware of the frequency or duration of the leave or teleworking that she would have needed as a result of her condition.

The day after plaintiff was diagnosed with diabetes, plaintiff informed Sott about her diagnosis and asked to discuss a potential accommodation. Sott told plaintiff they would set up a time to discuss an accomodation. Plaintiff did not inform any other individuals at CSB about her diagnosis at that time. Shortly thereafter, on April 1, 2014, plaintiff had a telephone conversation with Sott at which time Sott informed plaintiff that Sott was not satisfied with plaintiff's work, that plaintiff's attendance was unacceptable, and that plaintiff would need to provide medical documentation for plaintiff's absences during her probationary period.

On April 3, 2014, plaintiff contacted Angela Jones ("Jones"), a member of CSB's Department of Human Resources. Plaintiff informed Jones about her diabetes diagnosis and requested an accommodation from Jones. Specifically, plaintiff sought permission to telework in the mornings in the event that her blood sugar levels were too high. Plaintiff also asked Jones about her FMLA eligibility, and Jones informed plaintiff that she was ineligible for FMLA protections.[14] Finally, plaintiff told Jones about her conversation with Sott and expressed concerns about the effect of her absences on her probationary status. Following this

---

[14] A plaintiff must be employed with a company for at least 12 months to be eligible for FMLA leave. *See* 29 U.S.C. 2611(2)(A)(i).

conversation, Jones spoke with Suter and informed Suter that plaintiff raised concerns about the effect of her absences on her probationary status.

After the conversation with Jones on April 3, 2014, Suter reviewed plaintiff's time and attendance records and determined that plaintiff had, for 11 months, been using leave faster than she was earning it. Under Fairfax County policy, supervisors must give employees who are proposed for separation 10 business days to respond to a proposed separation memo before they are terminated. Given that plaintiff's one-year probationary period would end on April 21, 2014, Suter determined that she would need to propose separation promptly in order to accomplish plaintiff's separation before plaintiff automatically transitioned to merit status at the end of her probationary period. Accordingly, Suter sent an email to Berenson, Sott, and Jones on the evening of April 3, 2014, recommending that plaintiff be proposed for separation. The email proposed the following language for inclusion in a Proposed Unsatisfactory Service Separation memo:

> Throughout your probationary year you have experienced personal and medical issues resulting in excessive absences. These absences were documented as an issue on your 6-month probationary evaluation. They have prevented you from performing your job tasks on scheduled work days when you're absent.

Doc 62 Ex. 43. Sott responded to the email indicating that she was "really confused by all of this[,]"[15] to which Berenson responded saying that Suter would explain the next day. In her deposition, Sott explained that her confusion was not a result of the termination decision itself, but rather was because the decision was made "without really discussing how [her team] would be handling [the termination]." Sott Dep. 10:7-15.

On the morning of April 4, 2014, Suter met with Daryl Washington, the Deputy Director of CSB, and Berenson to discuss plaintiff's absences and to make a final decision on whether to

---

[15] Doc. 65 Ex. L.

retain plaintiff in merit status or to separate her at the end of her probationary period. At that point, Berenson, Washington, and Suter all agreed that plaintiff's separation was appropriate given the extent of plaintiff's excessive absences over the course of her probationary year. Later that same day, Suter and Berenson had conversations with Bartley and Sott to explain their decision to separate plaintiff, and Bartley and Sott both agreed in the recommendation. Thereafter, Berenson sent plaintiff a Proposed Unsatisfactory Service Separation memo containing the language Suter proposed on the evening of April 3, 2014. Plaintiff was terminated on April 18, 2014.[16]

Plaintiff brought this action on June 9, 2017, asserting three claims including discriminatory discharge in violation of the ADA, failure to provide reasonable accommodation as required by the ADA, and retaliation in violation of the ADA. On November 3, 2017, defendant moved for summary judgment on all three of plaintiff's claims.

## II.

The standard of review on motions for summary judgment is too well-settled to warrant extensive discussion. Under Rule 56, Fed. R. Civ. P., summary judgment is appropriate only where there is "no genuine dispute as to any material fact" such that the moving party "is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists if "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating this question, courts must "view the evidence in the light most favorable to . . . the nonmovant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The

---

[16] The parties' summary judgment briefs also contain several pages of facts concerning the progression of plaintiff's diabetes after her termination on April 18, 2014. These facts are excluded from the list of facts here because facts about plaintiff's illness *after* her termination are not material to the question whether defendant unlawfully discriminated against plaintiff in terminating her.

nonmovant, however, cannot rely on "mere allegations;" rather, the nonmovant "must set forth specific facts that go beyond the mere existence of a scintilla of evidence." *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (internal quotations and citations omitted).

## III.

Plaintiff asserts three claims on which defendant argues it is entitled to judgment as a matter of law: (i) discriminatory discharge or termination in violation of the ADA, (ii) failure to provide reasonable accommodation as required by the ADA, and (iii) retaliation in violation of the ADA. Each of these claims is addressed in turn.

## A.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge[.]" 42 U.S.C. § 12112(a). In this respect, the Fourth Circuit has recognized that discriminatory discharge or termination "may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework." *Jacobs v. N.C. Admin. Off. Cts.*, 780 F.3d 562, 572 (4th Cir. 2015). Under the *McDonnell Douglas* framework, plaintiff makes out a prima facie case of discriminatory termination by demonstrating that: "(1) [s]he was a qualified individual with a disability; (2) [s]he was discharged; (3) [s]he was fulfilling h[er] employer's legitimate expectations at the time of discharge; and (4) the circumstances of h[er] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (quoting *Rohan v. Networks Presentation* LLC, 375 F.3d 266, 273 n.9 (4th Cir. 2004) (internal quotation marks omitted)). Once the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. If the employer successfully does so, the burden shifts once again to the plaintiff to show that the

legitimate non-discriminatory reason is pretextual and that disability discrimination was the real reason for plaintiff's termination. *Jacobs*, 780 F.3d at 575-76. In other words, the plaintiff must show that plaintiff's disability was the "but-for" cause of her termination. *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235 (4th Cir. 2016).

With respect to plaintiff's prima facie case, the parties here do not dispute that plaintiff suffered from a disability or that plaintiff was discharged. But, as described below, the undisputed factual record discloses that plaintiff has not satisfied her burden of demonstrating that she was a "qualified individual" within the meaning of the ADA or that she was fulfilling the legitimate expectations of defendant. Accordingly, plaintiff's prima facie case fails.

To begin with, the undisputed record discloses that plaintiff was not a "qualified individual" within the meaning of the ADA. The ADA defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Fourth Circuit precedent makes clear that to determine whether a plaintiff is a "qualified individual," a court must consider "whether that person is able to perform the essential functions of the job in question" and "[i]f the person is unable to do so, the court must nevertheless determine whether the person could do the job with reasonable accommodation." *Myers v. Hose*, 50 F.3d 278, 281–82 (4th Cir. 1995) (citations omitted). In this respect, the plaintiff bears the burden of identifying a reasonable accommodation that would have permitted her to satisfy the essential functions of her job. *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464-65 (4th Cir. 2012).

The undisputed factual record here discloses that plaintiff was unable to perform the essential functions of her job as a mental health therapist because she was not meeting the job's

attendance requirements.[17]  It is well-settled in the Fourth Circuit that "[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate those skills by coming to work on a regular basis." *Tyndall v. Nat'l Educ. Ctrs, Inc. of Cali.*, 31 F.3d 209, 213 (4th Cir. 1994).  As such, "an employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." *Id.*  The undisputed factual record here reveals that plaintiff was not meeting the attendance requirements of her role as mental health therapist.  The record reflects that plaintiff was required to attend work, and, in particular, to work in the community 85% of the time.  *See* Doc. 62 Ex. 5 at 2.  Despite this requirement, plaintiff missed almost six weeks' worth of work in her 12 months of employment with CSB.  Defendant noted these attendance issues several times, marking plaintiff's attendance as "unacceptable" in her six-month probationary evaluation, discussing plaintiff's missing documentation and database entries in her nine month review, and identifying plaintiff's poor attendance as the cause for her termination in her separation memo.[18]

Nor does the fact that some of plaintiff's absences were caused by her disability alter this conclusion.  In *Tyndall*, the Fourth Circuit considered whether a teacher who frequently missed

---

[17] The parties spill a great deal of ink on the question whether plaintiff was capable of independently operating a motor vehicle, as required by the Wraparound Program, and whether it would be reasonable for defendant to accommodate plaintiff's diabetes by permitting her to telework on days when her blood sugar levels spiked. Although these facts might constitute separate grounds on which to decide whether plaintiff was a qualified individual, it is unnecessary to decide that question here because Fourth Circuit precedent makes clear that an individual cannot be qualified within the meaning of the ADA if she does not satisfy the attendance requirements of her job.

[18] Plaintiff attempts to avoid this conclusion by repeatedly disputing the characterization of her leave as excessive, but this effort is unavailing.  For one, plaintiff admits that she "took a lot of leave" in her first year of work and does not dispute the records associated with the leave she took.  Pl. Dep. 145:15-18; 175:9-17.  And importantly, it is axiomatic in the Fourth Circuit that "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *DeJarnette v. Corning*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996)).  Accordingly, the fact that plaintiff did not believe her leave was excessive is of no moment; what matters is whether her employer reasonably considered that the amount of plaintiff's leave was excessive in the circumstances and given the requirements of plaintiff's job.

work due to her autoimmune disorder was a "qualified individual" within the meaning of the ADA. The *Tyndall* court determined that the teacher's "frequent absences rendered her unable to function effectively as a teacher" and therefore she was not a "qualified individual" pursuant to the ADA, despite the fact that many of the teacher's absences were caused by her disability. *Id.* at 213-14. Significantly, the *Tyndall* court emphasized that the defendant's efforts in that case to accommodate the teacher's disability by permitting her to take sick leave, arrive late to work, leave early and take breaks had not improved plaintiff's attendance levels. Indeed, the court noted that an accommodation for plaintiff's disability could not possibly eliminate her attendance problems because many of her absences were related to her son's, and not to her own disability. *Id.*

*Tyndall* is on all fours with this case. Like the plaintiff in *Tyndall*, the record here discloses that plaintiff's absences affected her ability to function effectively as a mental health therapist. As in *Tyndall*, a years-worth of efforts to accommodate plaintiff by permitting her to arrive to work late, leave early, and take leave did not improve plaintiff's attendance. And significantly, no accommodation of plaintiff's disability could possibly improve plaintiff's attendance because a majority of plaintiff's absences, including all of her absences before her six-month review, were related not to plaintiff's disability, but to her plaintiff's daughter's illness or other personal reasons. In sum, because plaintiff's absences rendered her unable to fulfill the requirements of her job as a mental health therapist, and there is no evidence that accommodation of her disability would have permitted her to meet those requirements, plaintiff is not a "qualified individual" within the meaning of the ADA, as required to establish the first element of her prima facie case. In other words, plaintiff is not a "qualified individual" because defendant effectively provided plaintiff with her requested accommodation—the opportunity to

shape her schedule flexibly—throughout plaintiff's probationary year, and plaintiff's attendance was still unsatisfactory.

Plaintiff has also failed to adduce evidence showing that she was meeting the legitimate expectations of her employer, as required to satisfy the third element of her prima facie case. Again, the summary judgment record reflects that plaintiff took 132 hours of leave in her first six months of work. Sott warned plaintiff that her attendance was unacceptable in plaintiff's six-month probationary evaluation. After that, plaintiff took leave at an even higher rate, recording more than 107 additional hours of leave before her termination. Because of these absences, plaintiff missed documentation deadlines,[19] did not schedule required meetings with clients, and missed meetings when scheduled with clients, failing to satisfy the core requirements of her position. Accordingly, plaintiff has not satisfied the third element of her prima face case, namely demonstrating that she was meeting the legitimate expectations of her employer.

By contrast, plaintiff has adduced record evidence to raise an inference that a causal connection exists between plaintiff's disability and her termination, thereby satisfying the fourth element of her prima facie case. It is well-settled in the Fourth Circuit that temporal proximity alone can be sufficient to create a genuine dispute as to causation. *See Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001). The record here discloses that Suter proposed termination for plaintiff ten days after plaintiff told Sott about her diabetes diagnosis, and the very same evening that plaintiff shared the fact of her disability with Jones. Accordingly, the close temporal proximity here supports an inference of unlawful discrimination.

---

[19] Plaintiff argues that she proactively reached out about any documentation that may have been missing and that she eventually turned in the missing documents, but that fact is immaterial. Plaintiff was required to submit documentation at specific times throughout the program. *See* Doc. 62 Ex. 5. The undisputed factual record discloses many instances in which plaintiff failed to submit the required documentation on time. *See, e.g.*, Doc. 62 Ex. 28 (Sott's email noting that plaintiff had not updated database with weekly entries); Ex. 29 (Hotochin's email noting that she was missing documentation from plaintiff). Because plaintiff was not submitting documentation consistent with the requirements of the position, plaintiff was not fulfilling the requirements of the position.

In sum, although the proximity in time between plaintiff's telling her employer that she was diagnosed with diabetes and plaintiff's termination raises an inference of causation, plaintiff's prima facie case for her discriminatory discharge claim nonetheless fails because plaintiff has failed to satisfy the first and third element of her prima facie case. Specifically, plaintiff failed to adduce record evidence showing she was a "qualified individual" under the ADA, and the record does not reflect that plaintiff was meeting her employer's legitimate expectations. Accordingly, defendant is entitled to judgment as a matter of law on plaintiff's discriminatory discharge claim.

Even assuming, *arguendo*, that plaintiff has established a prima facie case of discriminatory discharge, plaintiff has failed to rebut defendant's legitimate, non-discriminatory reason for terminating plaintiff, namely plaintiff's excessive absences. The Fourth Circuit has made clear that "the ADA does not require [an] employer to simply ignore an employee's blatant and persistent misconduct, even when that behavior is potentially tied to a medical condition." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 305 (4th Cir. 2016) (citing *Jones v. Am. Postal Workers*, 192 F.3d 417, 429 (4th Cir. 1999); and *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n.3 (4th Cir. 1997)).[20] And, with respect to this misconduct, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *DeJarnette*, 133 F.3d at 299 (quoting *Evans*, 80 F.3d at 960–61).

Here, there is no dispute in the factual record that plaintiff took at least 132 hours of leave in her first six months,[21] that she was warned about taking excessive absences, and that she

---

[20] *See also Halpern*, 669 F.3d at 465 ("[T]he dismissal of an employee for attendance problems [does] not constitute discrimination, even if her disability caused her absences, [because] 'misconduct- even misconduct related to disability—is not itself a disability and may be a basis for dismissal.").

[21] Again although plaintiff focuses on the 132 hours of leave recorded in the human resources spreadsheet, plaintiff does not dispute that she actually took 145 hours of leave.

continued to take leave at an even higher rate following her probationary evaluation. Similarly, the factual record discloses that plaintiff's absences affected her ability to meet documentation deadlines and to attend scheduled meetings. For example, on March 4, 2014, plaintiff was scheduled to meet with the mother of a youth who was overheard discussing a gun before absconding from the home with a folding knife. *See* Pl. Dep. 108-110.[22] Plaintiff, however, was not able to meet with the youth's mother on the scheduled date because she took leave for car troubles. *See* Doc. 73 Ex. 8 (noting that on March 4 plaintiff informed her supervisor that she would be using unscheduled leave because the roads were not plowed in her neighborhood). And both Sott and another CSB employee communicated with plaintiff about missing documentation and plaintiff's failure to update important database entries. *See* Doc. 62 Ex. 28, 29. Accordingly, defendant has offered a legitimate, non-discriminatory reason for plaintiff's termination, and the burden shifts to plaintiff to point to record evidence showing that legitimate reason is pretext for discrimination.

Plaintiff attempts to establish that this legitimate, non-discriminatory reason for her termination is pretext for discrimination, but these attempts are unpersuasive. Specifically, plaintiff argues that the following facts establish pretext: (1) that the Proposed Unsatisfactory Service Separation memo mentioned plaintiff's "personal and medical issues"; (2) that plaintiff was terminated within ten days of informing her supervisor and one day of informing a human resources employee about her disability; (3) that Sott approved plaintiff's leave, was not consulted about plaintiff's termination, and was confused by plaintiff's termination; (4) that Hilda Perez, another probationary employee, took similar amounts of leave and was not terminated; and (5) that defendant has offered inconsistent justifications and post-hoc

---

[22] *See also* Doc. 73 Ex. 7 (confirming when plaintiff was scheduled to visit the youth's mother).

rationalizations for plaintiff's termination. For the reasons that follow, each of these facts fails to support a finding that defendant's reason for terminating plaintiff was pretext and that the true reason for plaintiff's termination was disability discrimination.

To begin with, plaintiff correctly notes that the Proposed Unsatisfactory Separation memo references plaintiff's "personal and medical issues" as contributing to plaintiff's poor attendance record. Doc. 62 Ex. 23. But Suter's unrefuted deposition testimony reflects that she included that language to reference the same medical issues addressed in plaintiff's six-month probationary review, namely the ongoing medical needs of plaintiff's daughter. *See* Suter Dep. 44:1-19. And plaintiff herself admits that she thought the memo was referring to her daughter's medical issues. *See* Pl. Dep. 284:15-20. As such, there is no support in the record for the proposition that Suter was referring to plaintiff's diabetes diagnosis in the proposed separation memo.

Plaintiff is also correct when she notes that there was a close temporal proximity between when plaintiff informed Sott and Jones of her diabetes diagnosis and when plaintiff was terminated. But this fact does not establish that defendant's legitimate non-discriminatory reason for terminating plaintiff is pretextual because there is an alternative explanation for the timing of plaintiff's termination that is wholly consistent with defendant's reason for terminating plaintiff. Specifically, the undisputed record discloses that Suter proposed termination for plaintiff on the night of April 3, 2014 because plaintiff's probationary period was expiring and defendant was required to give plaintiff ten business days in which to contest her separation. *See* Suter Dep. 51:16-52:9. Because there is an intervening event that explains the close proximity of plaintiff's diagnosis and her termination, this temporal proximity alone does not establish that defendant's legitimate reason for terminating plaintiff is pretext for discrimination.

Plaintiff next argues that defendant's legitimate non-discriminatory reason is pretextual because plaintiff's supervisor, Sott, approved all of plaintiff's leave, was not consulted in the termination decision, and was confused by the termination decision. None of these arguments is persuasive. To begin with, Sott explained in her deposition that "approval" of leave is a perfunctory exercise. As she testified, "it's not really a matter of approval[;]" rather, the employee simply contacts the supervisor to let her know that she will be using either sick leave or leave without pay for an illness. Sott. Dep. 63-64. In any event, even assuming Sott's approval were meaningful, Sott made clear that plaintiff's leave rate was unacceptable when she marked her attendance and punctuality as "not acceptable" on plaintiff's six-month probationary evaluation. *See* Doc. 62 Ex. 23. And, despite this warning, plaintiff thereafter took leave at an even higher rate.

Plaintiff also argues that the fact that Sott was not consulted in the termination decision and was confused by the decision establishes pretext, but this argument mischaracterizes the record evidence. The record reflects that Sott consulted with Bartley and Berenson about plaintiff's attendance issues, and in particular, about how those issues would affect plaintiff's transition to merit status. *See* Sott Dep. 29:17-30:5.[23] And when Suter distributed the proposed separation memo on April 3, 2014, she included Sott on the email. *See* Doc. 62 Ex. 43. Although Sott initially responded to Suter's email stating that she was "confused," she explained that her confusion was not a result of the termination decision itself, but rather was because the decision was made "without really discussing how [her team] would be handling [the termination]." Sott Dep. 10:7-15. There is no evidence in the record suggesting Sott did not agree with the termination decision; indeed, the record reflects that Sott and Bartley both agreed

---

[23] *See also* Berenson Dep. 18:21-19:8.

with the decision when Berenson and Suter met with them on April 4, 2014.  Accordingly, there is no evidence to suggest plaintiff's termination decision was the product of unlawful discrimination, owing to a lack of communication with plaintiff's supervisor.

Next, plaintiff attempts to show pretext by pointing to another employee who had comparable absences to plaintiff and was not terminated.  Where, as here, plaintiffs rely on comparator evidence, "the similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."  *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008).  The record discloses that the comparator plaintiff relies on is not, in fact, similarly situated.  Indeed, plaintiff took almost three times the amount of leave that the comparator, Hilda Calvo Perez, took in her probationary year.[24]  Accordingly, the fact that Perez was not terminated does not establish a genuine issue of material fact as to whether defendant's reasons for terminating plaintiff are pretext for discrimination.

Finally, plaintiff argues that since this litigation began, defendant has offered two justifications for plaintiff's termination—her poor performance and her falsification of records— that it did not offer at the time of her termination.  To be sure, courts have found that the fact that an employer offers "different justifications at different times" can be probative of pretext.  *See, e.g.*, *EEOC v. Sears Roebuck*, 243 F.3d 846, 852-53 (4th Cir. 2001).  But in those cases, defendants shifted their reasons for termination and offered new and inconsistent justifications throughout the litigation, thereby providing post-hoc rationalizations for conduct.  *See, e.g.*, *id.* at 852-53.[25]  By contrast here, defendant's rationale for the termination has never shifted; defendant

---

[24] The record discloses that Perez was hired as a mental health therapist in April 2013 and took 86 total hours of leave during her probationary year.  *See* Doc. 73 Ex. 3.  By contrast, Watson took more than 239 hours of leave in her probationary year.

[25] *See also, e.g.*, *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at different times, gives *different and arguably inconsistent explanations*, a jury may infer that the articulated reasons are pretextual." (emphasis added)); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An

has consistently stated that it terminated plaintiff because of her excessive leave and expressly denies that plaintiff was terminated for other reasons, such as falsification of records.[26] The evidence showing that plaintiff's performance was suffering, rather than creating inconsistencies in the record, simply supports defendant's argument that plaintiff's excessive absences were affecting her ability to perform her job satisfactorily and thus necessitated her termination. *See* Doc. 62 Ex. 44 (noting that plaintiff was terminated because her absences "prevented [defendant] from being able to effectively assess [plaintiff's] ability to perform [her] required job tasks throughout the year").[27]

Nor is there any evidence to support plaintiff's argument that these reasons were post-hoc rationalizations invented for the purposes of litigation. Plaintiff's attendance problems were regularly noted in the official documentation provided to plaintiff, including her six-month probationary evaluation,[28] and the emails describing missing database entries and documentation.[29] Indeed, plaintiff's termination memo stated explicitly that plaintiff's excessive absences "prevented [plaintiff] from performing [her] job tasks on scheduled work days when [she was] absent." Doc. 62 Ex. 44.

In sum, defendant has adduced a legitimate, non-discriminatory reason for plaintiff's termination, namely her excessive absences, and plaintiff has not established that reason is pretext for discrimination. Because plaintiff has failed to adduce record evidence showing that

---

employer's *changing rationale* for making an adverse employment decision can be evidence of pretext." (emphasis added)); *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (holding that a reasonable juror could infer that the shifting and inconsistent explanations given by the employer at trial were pretextual, developed over time to counter the evidence suggesting discrimination).

[26] Plaintiff's falsification of records was not a reason for plaintiff's termination. Defendant adduces this evidence only to emphasize the point that plaintiff's absences, the real reason for plaintiff's termination, were also affecting plaintiff's ability to perform her job.

[27] *See also* Doc. 73 Ex. 14 (noting that plaintiff was terminated because she "has not been able to perform her duties"); Sott Dep. 45:8-14 ("[I]f you are not present to have the meetings, the service planning can't take place.").

[28] *See* Doc. 62 Ex. 23

[29] *See* Doc. 62 Ex. 28, 29.

defendant's reasons for terminating plaintiff were pretextual, defendant is entitled to judgment as a matter of law on plaintiff's discriminatory discharge claim.

**B.**

With respect to plaintiff's failure to accommodate claim, a plaintiff makes out a prima facie case by showing "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (citing *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999))). There is no dispute with respect to the first two elements of plaintiff's failure to accommodate claim, namely that plaintiff suffered from a disability within the meaning of the statute and that defendant had notice of plaintiff's disability. Instead, the parties focus the dispute on whether plaintiff could perform the essential functions of her position with reasonable accommodation, as required by the third element of a failure to accommodate claim.

Plaintiff's prima facie case fails because the record discloses that plaintiff could not perform the essential functions of her position, even with reasonable accommodation, as required to satisfy the third element of plaintiff's failure to accommodate claim. Again the Fourth Circuit's decision in *Tyndall v. National Education Centers, Inc. of California* is instructive here. The plaintiff there missed excessive amounts of work owing to her disability and to her son's illness. *Tyndall*, 31 F.3d at 213-14. The Fourth Circuit determined that the plaintiff there could not perform the essential functions of her position with a reasonable accommodation because the record disclosed that defendant had attempted to accommodate plaintiff by allowing her to take

sick leave, arrive to work late, and leave early, and despite these accommodations, plaintiff still failed to satisfy the attendance requirements of the job. *Id.* Significantly, the *Tyndall* court also noted that to accommodate plaintiff's disability would never fully solve the plaintiff's attendance problems because a majority of her absences were the result of her son's illness, and not her own disability. *Id.*

Similarly, plaintiff here did not satisfy the attendance requirements of her job during her probationary employment period. And, as in *Tyndall*, despite defendant's efforts to accommodate plaintiff by allowing plaintiff to take leave, to arrive early, and to leave late, plaintiff was still not able to fulfill the attendance requirements of her job. Perhaps most importantly, to accommodate plaintiff's disability could not possibly have eliminated plaintiff's attendance problems because a majority of her absences were the result of her daughter's illness and plaintiff's own personal errands, not plaintiff's disability. In sum, plaintiff has failed to demonstrate a reasonable accommodation would have enabled her to meet attendance requirements, and perform the essential functions of, her job, as required by the third element of a failure to accommodate claim. Accordingly, plaintiff's failure to accommodate claim fails.

It is also important to note that, in the Fourth Circuit, an employer is not required to accommodate a disability by excusing past misconduct even when that misconduct might have been caused by the disability. *See Halpern*, 669 F.3d at 465 ("[T]he law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability."). In *Halpern*, the Fourth Circuit found that defendant, a medical school, did not unlawfully fail to accommodate plaintiff because by the time the plaintiff informed the defendant about his disability, "he had already engaged in numerous unprofessional acts that warranted his dismissal[.]" *Id.* at 465. The Fourth Circuit made clear that the employer was not

required to give the plaintiff a "second chance" by accommodating his disability when he had already engaged in a long pattern of misconduct. *Id.* Similarly here, defendant did not unlawfully fail to accommodate plaintiff by refusing to ignore plaintiff's 12-month pattern of misconduct, even where some of those absences may have been the result of a disability. Accordingly, for these reasons as well, plaintiff's failure to accommodate claim must fail, and defendant is entitled to judgment as a matter of law on this claim.

## C.

Plaintiff asserts her retaliation claim pursuant to § 12203 of the ADA, which provides, in relevant part, that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To prevail on an ADA retaliation claim, a plaintiff must first make out a prima facie case that "(1) [s]he engaged in protected conduct, (2) [sh]e suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds*, 701 F.3d at 154. As with discriminatory discharge claims, the *McDonnell Douglas* burden shifting framework applies to retaliation claims and requires the plaintiff to establish that any legitimate, non-retaliatory reason offered by the defendant for the plaintiff's termination is pretext for unlawful retaliation. *See Jacobs*, 780 F.3d at 576.

The parties do not dispute that plaintiff engaged in protected conduct when she reported her diabetes diagnosis and requested an accommodation for her diabetes. Nor do the parties dispute that plaintiff suffered an adverse employment action when she was terminated. The dispute here focuses on the causal connection between plaintiff's protected activity and the

adverse employment action as well as plaintiff's inability to rebut the legitimate, non-retaliatory reasons offered by defendant for plaintiff's termination.

In the end, to support the third element of plaintiff's prima facie case and to rebut defendant's legitimate non-retaliatory reason for terminating plaintiff, plaintiff relies on the same exact facts that plaintiff marshalled in her discriminatory discharge claim: (1) that the decision to terminate plaintiff was made the same day she informed human resources of her disability diagnosis; (2) that the unsatisfactory separation memo referenced plaintiff's "personal and medical issues"; (3) that Sott approved plaintiff's leave and was confused by plaintiff's termination; (4) that Hilda Perez, another probationary employee, took similar amounts of leave and was not terminated; and (5) that defendant has offered inconsistent justification and post-hoc rationalizations for plaintiff's termination. But, for the same reasons described above, these facts fare no better for plaintiff's retaliation claim than they did for plaintiff's discriminatory discharge claim, and accordingly, defendant is entitled to judgment as a matter of law on this retaliation claim as well.

## IV.

In sum, the undisputed record evidence discloses that plaintiff took a significant amount of leave in the 12 months that she worked for defendant, and that, as a result of this leave, plaintiff failed to hold required meetings with clients, regularly missed documentation deadlines, and was not satisfying the requirements of her job. Defendant subsequently made the decision to terminate plaintiff in her probationary period before she transitioned to a merit status employee based on plaintiff's excessive absences. Because plaintiff has adduced no record evidence to suggest that this legitimate, non-discriminatory and non-retaliatory reason for terminating

plaintiff is pretextual, defendant is entitled to judgment as a matter of law on all three of plaintiff's claims.

An appropriate Order will issue.

Alexandria, Virginia
February 28, 2018

/s/

T. S. Ellis, III
United States District Judge